UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| AUGUSTA FUEL CO., | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | CV-06-82-B-W |
| | ) | |
| BOND SAFEGUARD | ) | |
| INSURANCE CO., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

After Augusta Fuel Company (Augusta Fuel) pre-paid PPCOM, Inc. $1,625,000 for delivery of 1,300,000 gallons of fuel under a supply contract, PPCOM failed to satisfy its promise to deliver the full quantity of fuel. Augusta Fuel now seeks to redeem the bond posted by PPCOM and issued by Bond Safeguard Insurance Co. (Bond Safeguard).

## I.   PROCEDURAL HISTORY

On July 19, 2006, Augusta Fuel[1] filed suit against Bond Safeguard[2] to recover payment on a surety bond. *Compl*. (Docket # 1). The Complaint alleges that Bond Safeguard issued a Supply Contract Bond (Bond) in the amount of $1,625,000 as surety for PPCOM, Inc., which had contracted to supply oil to Augusta Fuel. *Id*. ¶¶ 8, 10. After PPCOM defaulted and failed to deliver product, Bond Safeguard refused to indemnify Augusta Fuel; Augusta Fuel initially sought the Bond amount of $1,625,000 in damages. *Id*. ¶¶ 11-15. On December 6, 2006, Bond Insurance filed a third-party complaint against its agent, Skillings Shaw & Associates, Inc. (SSA), seeking contribution and/or indemnification under theories of negligence and negligent misrepresentation. *Third-*

---

[1] Augusta Fuel is a Maine corporation with a principal place of business in Augusta, Maine. *Compl*. ¶ 1.
[2] Bond Safeguard is an Illinois corporation with a principal place of business in Lombard, Illinois, and is authorized to transact surety insurance in Maine. *Compl*. ¶ 2.

*Party Compl.* (Docket # 8).  Augusta Fuel now moves for summary judgment, seeking an award in the amount of $1,169,102 plus interest.  *Pl.'s Mot. for Summ. J.* (Docket # 20) (*Pl.'s Mot.*).  Bond Safeguard opposes the motion, arguing that its obligations under the Bond should be discharged because Augusta Fuel and PPCOM materially altered the payment terms of the underlying contract, and because there are issues of material fact as to the contract and damages.  *Def.'s Obj. to Pl.'s Mot. for Summ. J. with Incorporated Mem. of Law* at 7 (Docket # 27) (*Def.'s Obj.*).

## II.    STATEMENT OF FACTS

### A.    The Master Agreement

On August 2, 2004, Augusta Fuel entered into a Master Distillate and Gasoline Sales and Supply Agreement (Master Agreement) with PPCOM.  *Pl.'s Statement of Material Facts* ¶ 1 (Docket # 21) (PSMF); *Defendant's Resp. to Pl.'s Statement of Material Facts* ¶ 1 (Docket # 30) (DRPSMF).  The Master Agreement contemplated that Augusta Fuel and PPCOM "may enter into various types of transactions, the specific commercial terms for which will be contained in separate sales confirmations referencing this Master Agreement and forming a part hereof."  PSMF, Attach. 4 (Docket # 21-4) (*Master Agreement*).  With regard to sales confirmations, the Master Agreement states:

> Each transaction between Buyer and Seller for the sale and purchase of Product will be evidenced by a sales confirmation, in the form attached to this Master Agreement as ATTACHMENT 1, (the "Sales Confirmation"), executed by Buyer and Seller.  The Sales Confirmation will specify the Product to be purchased and sold, quantity, purchase price, payment terms, delivery locations, delivery period, delivery schedule and any other particular commercial terms and conditions applicable to such transaction.  All other terms and conditions governing any such transaction will be set forth in this Master Agreement.

*Id.*  In addition, the Master Agreement provides that "[u]nless otherwise specified in a Sales Confirmation, Buyer will prepay the purchase price for all products."  *Id.*

### B.      The "Original Sales Confirmation"

On March 21, 2005, Bond Safeguard received from its agent, SSA, a request for a supply bond for PPCOM, as Principal, and Augusta Fuel, as Obligee.  *Def.'s Statement of Additional Material Facts* ¶ 15 (Docket # 30) (DSAMF); *Pl.'s Resp. to Def.'s Statement of Additional Material Facts* ¶ 15 (Docket # 32) (PRDSAMF).  With the request, Bond Safeguard received a document, which Bond Safeguard refers to as the "Original Sales Confirmation."  DSAMF ¶ 16; PRDSAMF ¶ 16.  Bond Safeguard refers to another sales confirmation previously signed by both parties on March 18, 2005 as the "Subsequent Sales Confirmation."[3]

The Original Sales Confirmation carries the date August 2, 2004 at the top, but is unsigned by either PPCOM or Augusta Fuel.  It describes itself as a "Sales Confirmation . . . issued pursuant to the above identified Master Distillate and Gasoline Sales Agreement by and between P.P.C.O.M., INC. and AUGUSTA FUEL CO."  Below the introduction, the document reads:

> PRODUCT:
> QUANTITY:
> PAYMENT TERMS:  UPON SIGNING THIS AGREEMENT
> DELIVERY  LOCATION(S):    MaineGeneral Medical Center, Augusta and
> Waterville campuses, and to Augusta Fuel Co. bulk plants.

---

[3] Although for purposes of this motion, the Court views the facts in the light most favorable to Bond Safeguard, the Court is constrained to note that the Original Sales Confirmation appears to be a draft of the Subsequent Sales Confirmation.  The addenda to the original are in handwriting with notations in the margin and the document itself is incomplete.  The subsequent document is typewritten, with price and quantity terms filled in, and the signatures of the representatives of Augusta Fuel and PPCOM.  For purposes of the motion, the Court accepts Bond Safeguard's characterization of the document.  In any event, the Original Sales Confirmation states that payment would be "in full."  This term also appears on the Subsequent Sales Confirmation

DELIVERY PERIOD:  July 1, 2005 – June 30, 2006, with the option to extend until Dec. 31, 2006 if consumption is less than estimated.
DELIVERY SCHEDULE:  ** see grid
OTHER:  All costs of transportation and markup are included.  A performance bond in the amount of this sales confirmation will be issued upon receipt of payment.
PURCHASE PRICE:  $

DATES:  July 01, 2005 – June 30, 2006, as needed **
GALLONS PORTION
OF TOTAL VOLUME:  _____gals.
PRICE PER GALLON  $_____/ gal.

TOTAL VALUE OF CONTRACTS:        $_____
TOTAL DEPOSIT/PREPAYMENT:        $___IN FULL_____
Agreed and accepted as of (date) _____, 2005
Seller:  P.P.C.O.M., INC.                      Buyer:  AUGUSTA FUEL
By:_____                          By:_____
Kathleen S. Marston Thompson, It's President        Print Name and Date

Witness_____ Witness_____
          Print Name:                                      Print Name:

**PLEASE SIGN AND FAX IMMEDIATELY TO 207-465-7959
THEN MAIL ORIGINAL TO:  P.O. BOX 338, OAKLAND, ME 04963.
THANK YOU.**

Although SSA sent Bond Safeguard a copy of the above document, it did not forward to Bond Safeguard the executed sales confirmation of March 18.  DSAMF ¶ 20; PRDSAMF ¶ 20.

C.      The "Subsequent Sales Confirmation"

On March 18, 2005, Augusta Fuel and PPCOM executed a sales confirmation substantially in the same form as the Original Sales Confirmation, except fully signed and with all the relevant information inserted:

PRODUCT:  # 2 fuel
QUANTITY:  1,300,000. gallons
PAYMENT TERMS:  DUE ON OR BEFORE MARCH 28, 2005
DELIVERY LOCATION(S):  MaineGeneral Hospital, Augusta and Waterville campuses, and to Augusta Fuel Co. bulk plants.

DELIVERY PERIOD:  July 1, 2005 – June 30, 2006, with the option to extend
until Dec. 31, 2006 if consumption is less than estimated. *
DELIVERY SCHEDULE: ** see grid
OTHER:  All costs of transportation and markup are included.
PURCHASE PRICE:  $1,625,000.00

**

DATES:          July 1, 2005 – June 30, 2006, AS NEEDED*

GALLONS PORTION
OF TOTAL VOLUME:          1,300,000.

PRICE PER GALLON:          $1.2500

TOTAL VALUE OF CONTRACTS:                     $__1,625,000.00__
TOTAL DEPOSIT/PREPAYMENT:                     $__IN FULL__

Agreed and accepted as of (date) Mar. 18___, 2005.

Seller: P.P.C.O.M., INC.                                BUYER: AUGUSTA FUEL CO.
By:_____s/                                By:_____s/
Kathleen S. Marston Thompson, It's President   Print Name and title: Marc V.
                                                                   Lacasse, President
Witness_____s/                            Witness:_____s/
   Print Name:  Kim E. Poulin                              Print Name:  Paul G. Nadeau

**PLEASE SIGN AND FAX IMMEDIATLEY TO 207-465-7959
THEN MAIL ORIGINAL TO:  P.O. BOX 338, OAKLAND, ME 04963
THANK YOU.**

**D.     Bond Approval**

On March 22, 2005, Bond Safeguard approved the request for the bond, DSAMF

¶ 19; PRDSAMF ¶ 19, and on March 25, 2005, it issued the Supply Contract Bond in the

amount of $1,625,000, with PPCOM as principal and Augusta Fuel as obligee, PSMF

¶ 5; DRPSMF ¶ 5.[4]

---

[4] Under the terms of the Bond, PPCOM, as the Principal, and Bond Safeguard, as the Surety, were held
bound to the payment made by Augusta Fuel, the Obligee.  DRPSMF, Attach. 7 (Supply Contract Bond).
The Bond further provides:

### E.      PPCOM's Breach and Augusta Fuel's Claim

Nearly a year later, on about March 17, 2006, PPCOM defaulted on the contract by ceasing to deliver oil to Augusta Fuel.  PSMF ¶ 7; DRPSMF ¶ 7.  At that point, PPCOM had delivered 732,363 gallons of fuel, with 567,637 gallons remaining to be delivered under the contract.  PSMF ¶ 8; DRPSMF ¶ 8.[5]  Augusta Fuel has received no product from PPCOM since March 17, 2006, PSMF ¶ 9.[6]  Augusta Fuel borrowed money to purchase some replacement fuel, which cost $1,169,102.  PSMF ¶ 10.[7]  In addition, Augusta Fuel incurred $91,213.37 in interest costs as of April 30, 2007.  PSMF ¶ 11;

---

WHEREAS, the Principal has entered into a certain written contract with the Obligee dated the 2nd day of AUGUST, 2004, to furnish the following briefly described supplies:  <u>SUPPLY 1,300,000 GALLONS OF #2 HEATING OIL DURING THE PERIOD JULY 1, 2005 TO JUNE 30, 2006, AS NEEDED, TO VARIOUS LOCATIONS OF THE MAINE GENERAL MEDICAL CENTER'S AUGUSTA AND WATERVILLE CAMPUSES, AND/OR TO THE AUGUSTA FUEL CO. BULK PLANTS</u>, which contract is hereby referred to and made a part hereof as fully and to the same extent as if copied at length herein.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH that if said Principal shall fully indemnify and reimburse the Obligee for any loss that he/she (they, it) may suffer through the failure of Principal to furnish said supplies in accordance with the terms of said contract, at the time(s), and in the manner therein specified, then this obligation shall be void, otherwise to remain in full force and effect.

*Id.* (emphasis in original); *Stipulation* (Docket # 22).

[5]  However, according to Bond Safeguard, "AFC delivered an additional 49,451.5 gallons of fuel oil to Maine General Hospital from other sources during the contract period while PPCOM was still in business in violation of the Sales Confirmation and Master Agreement.  These deliveries were not accounted for in AFC's claim. . . .  The additional oil delivered by AFC to Maine General Hospital, had it been applied to the contract, would reduce the AFC's claim on the Bond."  DRPSMF ¶ 8.

[6]  The Court ascertains that DRPSMF ¶ 10 is responsive to PSMF ¶ 9, and that DRPSMF ¶ 9 is responsive to PSMF ¶ 10, not the other way around.

[7]  Although Bond Safeguard denies this statement, it does not adequately controvert the assertion that Augusta Fuel paid $1,169,102 to replace the undelivered fuel.  DRPSMF ¶ 9.  Bond Safeguard simply reiterates its argument that Augusta Fuel ordered an additional 49,451.5 gallons of fuel from other sources while PPCOM was still in business, and that Augusta Fuel is not entitled to a $0.10 surcharge on all replacement fuel delivered.  *Id.*  The Court addresses these arguments below.

DRPSMF ¶ 11.[8]  On March 20, 2006, Augusta Fuel notified Bond Safeguard, in writing, of PPCOM's default, and demanded that Bond Safeguard indemnify and reimburse Augusta Fuel for its losses.  PSMF ¶ 12; DRPSMF ¶ 12.  On March 29, 2006, Augusta Fuel filed, under oath, a formal Proof of Claim with Bond Safeguard, which it subsequently amended.  PSMF ¶ 13; DRPSMF ¶ 13.  To date, Bond Safeguard has neither indemnified nor reimbursed Augusta Fuel.  PSMF ¶ 14; DRPSMF ¶ 14.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to . . . judgment as a matter of law." FED. R. CIV. P. 56(c); *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006).  Summary judgment may enter when a party fails to show sufficient evidence to establish an essential element of his case on which he bears the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Once the movant avers 'an absence of evidence to support the nonmoving party's case,' the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'" *Sheinkopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir. 1991) (citations omitted).  A fact is "material" if it has the "'potential to affect the outcome of the suit under the applicable law.'" *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)).  For an issue to be "genuine," the evidence relevant to the issue, viewed in the light most flattering to the nonmoving party, must be "sufficiently open-ended to permit a

---

[8] Bond Safeguard's denial does not properly controvert Augusta Fuel's statement of material fact.  Rather, the Court construes the response as a qualification, in that it provides the Court with the correct interest figure from the document that supports the statement.

rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). Rather, "[t]he evidence illustrating the factual controversy . . . must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve . . . ." *Mack v. Great Atl. & Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st. Cir. 1989) (citing *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975)).

## IV.    DISCUSSION

Augusta Fuel has made out a *prima facie* case for Bond Safeguard's liability under the Bond: Augusta Fuel and PPCOM signed the Master Agreement in August 2004; they signed a sales confirmation referencing that agreement on March 18, 2005; PPCOM posted a bond issued by Bond Safeguard on March 24, 2005; PPCOM breached the contract on March 17, 2006; Augusta Fuel notified Bond Safeguard of the default on March 20, 2006, seeking to collect on the Bond; and Bond Safeguard has refused to honor the Bond.

The question is whether Augusta Fuel is entitled to summary judgment on its claim under the Bond, including Bond Safeguard's affirmative defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *GE Capital Healthcare Fin. Servs. v. Fall River Walk-In Emergency Med. Office*,

Civil Action No. 02-11789-RCL, 2004 U.S. Dist. LEXIS 75, at *9 (D. Mass. Jan. 7, 2004).  As the First Circuit has aptly stated:

> While an inquiring court is constrained to examine the record in the light most favorable to the summary judgment opponent and to resolve all reasonable inferences in that party's favor, . . . defeating a properly documented motion for summary judgment requires more than the jingoistic brandishing of a cardboard sword. This is especially true in respect to claims or issues on which the nonmovant bears the burden of proof; in such circumstances she must reliably demonstrate that specific facts sufficient to create an authentic dispute exist.

*Int'l Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir. 1996) (internal citations and quotation marks omitted).  As regards Bond Safeguard's affirmative defenses on which it would have the burden at trial, Augusta Fuel is entitled to summary judgment unless Bond Safeguard can identify facts sufficient to create an authentic dispute.

### A.    Material Alteration

Bond Safeguard's affirmative defense is that, without Bond Safeguard's knowledge or consent, Augusta Fuel and PPCOM materially altered the contract after the execution of the bond.  *Answer* at 3 (Docket # 4) ("Augusta's claims are barred as a result of cardinal change of the underlying contract between P.P.C.O.M., Inc., and Augusta.").  That is, according to Bond Safeguard, "by requiring full payment up front for all oil to be delivered under the sales confirmation, rather than prepayment before a specific oil delivery, the Subsequent Sales Confirmation fundamentally altered the nature of the transaction and is not a transaction Bond Safeguard would have bonded."  *Def.'s Obj*. at 4.

It is black-letter law that "any material alteration in the terms of a contract for the performance of which a surety is bound, if made without the surety's consent, releases him from liability." *United States v. JMG Excavating & Constr. Co.*, Civil No. 03-134-P-S, 2004 U.S. Dist. LEXIS 23245, at *60-61 (D. Me. Nov. 17, 2004) (quoting *Maine Cent. R.R. Co. v. Nat'l Sur. Co.*, 94 A. 929, 931 (Me. 1915); RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 41.[9] This is an affirmative defense, so Bond Safeguard has the burden to prove (1) that there was a material alteration of the contract; and (2) that the change was made without Bond Safeguard's consent. *Id*.

The first issue is whether Bond Safeguard has met its burden to prove that the underlying obligation was materially altered. Viewing the facts in the light most favorable to the non-moving party, Bond Safeguard, the Court will assume that there was

---

[9] The Restatement provides:

> If the principal obligor and the obligee agree to a modification, other than an extension of time or a complete or partial release, of the principal obligor's duties pursuant to the underlying obligation:
>
> (a) any duty of the principal obligor to the secondary obligor of performance or reimbursement is correspondingly modified;
>
> (b) the secondary obligor is discharged from any unperformed duties pursuant to the secondary obligation:
>
>> (i) if the modification creates a substituted contract or imposes risks on the secondary obligor fundamentally different from those imposed pursuant to the transaction prior to modification;
>>
>> (ii) in other cases, to the extent that the modification would otherwise cause the secondary obligor a loss . . . .

RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 41.

both an Original Sales Confirmation and a Subsequent Sales Confirmation, as Bond Safeguard claims.[10]

### 1.    The Agreements

#### a.    Master Agreement

Under the Master Agreement, signed August 2, 2004, Augusta Fuel was to "prepay the purchase price for all products," unless a Sales Confirmation provided otherwise, and that: "Each transaction between Buyer and Seller for the sale and purchase of Product will be evidenced by a sales confirmation . . . ." *Master Agreement*.  Bond Safeguard contends that this language suggests that the parties contemplated numerous transactions, not a single payment for a large amount of oil.

#### b.    Original Sales Confirmation

The undated Original Sales Confirmation, which Bond Safeguard received from its agent, SSA, lacked price or quantity terms and provided that Augusta Fuel was to make payment "upon signing this agreement."  *Def.'s Obj.*, Ex. A (Docket # 27-2) (Original Sales Confirmation).  In addition, the document listed the delivery dates as July 1, 2005 to July 30, 2006, as needed.  *Id.*

#### c.    Subsequent Sales Confirmation

Finally, the Subsequent Sales Confirmation, dated March 18, 2005, contained signatures of the parties, added price and quantity terms, and changed the payment term to "due on or before March 28, 2005."  *Def.'s Obj.*, Ex. B (Docket # 27-3) (Subsequent Sales Confirmation).  It is this last term that Bond Safeguard contends is the material change.

---

[10] Augusta Fuel maintains it is unaware of the Original Sales Confirmation.  PRDSAMF ¶ 22 ("The Original Sales Confirmation [was] sent to Bond Safeguard by its agent Skillings Shaw.  It was not in AFC's files and [Marc] Lacasse had not seen it before his deposition.").

### 2.      Material Change

#### a.      *Southwood Builders*

Claiming that payment of large sums before they are due constitutes a material change in the contract, Bond Safeguard rests its hopes on *Southwood Builders, Inc. v. Peerless Ins. Co.*, 366 S.E.2d 104, 106 (Va. 1988).  In *Southwood*, the plaintiff entered into a general contract and a subcontract.  The subcontractor posted a performance bond referencing the subcontract, with the defendant as surety.  Under the subcontract, the plaintiff was to make payment to the subcontractor as the work progressed.  Nearly a year after the execution of the bonds, the plaintiff became concerned that the subcontractor would be unable to complete the work.  Rather than terminating the contract, the plaintiff proposed a change in the subcontract:  the plaintiff would pay for all additional materials and an additional crew, and deduct those expenses from the subcontractor's progress payments.  Eventually, the subcontractor informed the plaintiff that it was unable to complete the job, but owed the plaintiff over $11,000.  The plaintiff notified the defendant of the default, and sought to collect on the bond.  The trial court held that the plaintiff could not recover on the performance bond because "there had been material variations in the subcontract which prejudiced the rights of [the defendant]."  *Id.* at 106. The appellate court agreed that there was a material deviation in the contract, which resulted in a diminishment of funds "that should have been available to the surety in case of default . . . and undermine[d] the inducement to the contractor to finish the work on schedule in order to be paid."  *Id.* at 108.

b.        **Stark Differences**

The case at bar is starkly different.  First, even viewing the facts in the light most favorable to Bond Safeguard – that the Subsequent Sales Confirmation modified the Original Sales Confirmation – this event occurred *before* Bond Safeguard issued the bond on the full amount of Augusta Fuel's payment, unlike in *Southwood*, where the alteration in the contract occurred a year after the bond posted.

Second, the Court cannot conclude that either version of the sales confirmation materially altered the Master Agreement as Bond Safeguard suggests.  Bond Safeguard claims certain language shows that the agreement contemplated multiple deliveries. *Def.'s Obj.* at 11.[11]  The Court concludes, rather, that the contract only required Augusta Fuel to pay for the product before receiving it, which it did.  Nothing in the Master Agreement or Original Sales Confirmation precluded Augusta Fuel from prepaying the balance of the entire contract.  As the Plaintiff points out, Bond Safeguard, under its interpretation of the contract, would have issued bonds for each delivery of fuel by PPCOM and payment by Augusta Fuel, which could have numbered in the hundreds. That is because the Original Sales Confirmation (which, according to Bond Safeguard, is controlling) contains the following language:  "A performance bond in the amount of this sales confirmation will be issued upon receipt of payment."  This interpretation defies common sense, especially in light of the language on the face of the Bond where the

---

[11] In particular, Bond Safeguard is concerned with the section on sales confirmations ("Each transaction between Buyer and Seller for the sale and purchase of Product will be evidenced by a sales confirmation . . . .") and the section on payment, late charges, and deficiency fee ("Unless otherwise specified in the Sales confirmation, Buyer will prepay for all products.  In the event that buyer fails to make any payment when due, Buyer will pay Seller a service fee and late charge on the unpaid portion of the purchase price equal to the lesser of the maximum rate permitted by law or 1.5% per month . . . ."). Arguing that there could be no late charge on payment in full, Bond Safeguard concludes that "[t]his language established that AFC would pay PPCOM in advance for each delivery of fuel oil made pursuant to a particular sales confirmation."  *Def.'s Obj.* at 11.

dollar amount and quantity listed on the Bond is the full dollar amount and quantity under the contract, signaling that Bond Safeguard was issuing a bond for the full amount prepaid by Augusta Fuel, not on a delivery-by-delivery basis.

Bond Safeguard further argues that "the Bonded Contract called for payment for individual deliveries of fuel oil as delivered." *Def.'s Obj.* at 11.  According to Bond Safeguard:

> This language established that AFC would pay PPCOM in advance for each delivery of fuel oil made pursuant to a particular sales confirmation.  The language in section 2 of the Master Agreement discussing service and late fees on the unpaid purchase price is consistent with this interpretation.  Late fees and interest would not be necessary on a single advance payment transaction for a substantial quantity of oil.

*Id.*  Bond Safeguard's argument that it relied on the language in the Master Agreement in approving the Bond is compromised by its admission that it did not even review the Master Agreement before approving the Bond.[12]  Instead, Bond Safeguard makes the claim that it would not have approved the Bond if it had known that Augusta Fuel was prepaying the entire contract amount.  However, Bond Safeguard took no actions to investigate the payment terms, and at the time the Bond was executed on March 24, 2005, the Subsequent Sales Confirmation – outlining the requirement of prepayment – had been in existence nearly a week.

---

[12] David Campbell, of Bond Safeguard, testified:

> Q:  Isn't it true that you didn't even review the contract before you issued the bond?
> A:  Correct.
> Q:  And you didn't rely on any language in the contract, did you?
> A:  No.

DRPSMF, Attach. 5 at 3 (Docket # 30-5).

The Court concludes that the contract is consistent with the sales confirmations. First, the Master Agreement incorporates by reference all sales confirmations ("Seller and Buyer may enter into various types of transactions, the specific commercial terms for which will be contained in separate sales confirmations referencing this Master Agreement and forming a part hereof."). The Master Agreement is merely a framework for the transactions between Augusta Fuel and PPCOM; the details of the transactions, including price, quantity, and the timing of payment, were necessarily contained within the individual sales confirmations. Therefore, Bond Safeguard could not have approved a bond on this Master Agreement alone. Nor could it have approved it on the basis of the draft sales confirmation, which lacked price and quantity terms. In sum, Bond Safeguard has failed to set forth sufficient facts to support its affirmative defense that Augusta Fuel and PPCOM materially altered the contract after the Bond was issued.

### B.    Due Diligence

Even if the Subsequent Sales Confirmation did constitute a material alteration of the Master Agreement and Original Sales Confirmation, Bond Safeguard does not prevail. Generally "it is the duty of sureties to look out for themselves and ascertain the nature of [their] obligations. . . .  Underlying this duty is the notion that . . . the policy behind surety bonds is not to protect a surety from its own laziness or poorly considered decision. . . .  As a result, sureties must usually take the initiative and inquire about information they deem important." *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d Cir. 1995) (citations and internal quotation marks omitted). The Subsequent Sales Confirmation, which Bond Safeguard claims materially altered the contract, was in existence at the time it issued the Bond – it was actually signed by the parties about a

week before.  Had it exercised due diligence, Bond Safeguard could have ascertained the true nature of the contract, rather than operating under assumptions and purported representations by its agent, SSA.  Bond Safeguard claims that it never would have issued the Bond had it known that Augusta Fuel would pre-pay for the entire contract; but, its failure to investigate does not relieve it of its obligations under the Bond.

### C.    Contract Terms

Next, Bond Safeguard argues that Augusta Fuel is not entitled to summary judgment because there are disputed issues of material fact regarding the terms of the Bond and the bonded contract.  *Def.'s Obj.* at 12.  These arguments also fail.

First, Bond Safeguard asserts that, because "the Bond makes no reference to either the Original Sales Confirmation that Bond Safeguard reviewed in deciding whether to issue the Bond, or the subsequent Sales Confirmation," it is impossible to determine the purchase price or payment terms merely from the literal wording of the bond. However, the Bond states that PPCOM and Bond Safeguard "are held and firmly bound unto AUGUSTA FUEL COMPANY . . . in the just and full sum of ONE MILLION SIX HUNDRED TWENTY FIVE THOUSAND AND NO/100 ($1,625,000) dollars . . . ."  In addition, it references the agreement between Augusta Fuel and PPCOM as follows: "SUPPLY 1,300,000 GALLONS OF #2 HEATING OIL DURING THE PERIOD JULY 1, 2005 TO JUNE 30, 2006 . . . ."  Since the Bond contains the quantity term (1,300,000 gallons) and the total price term ($1,625,000), one can easily determine that Augusta Fuel paid $1.25 per gallon.[13]  As for the payment terms, the Master Agreement, which the Bond references, indicates that Augusta Fuel will pre-pay for all product.

---

[13] The Court also notes that Bond Safeguard could not have obtained this information from the Master Agreement, which did not contain Augusta Fuel's purchase price or the quantity term.

Next, Bond Safeguard argues that there are "ambiguities in the payment terms that make summary judgment inappropriate." *Def.'s Obj*. at 13.  That is, under the Original Sales Confirmation, the payment terms are "UPON SIGNING THIS AGREEMENT," but includes no further information.  This argument merely bolsters the conclusion that the Subsequent Sales Confirmation, which was entered into before Bond Safeguard issued the Bond, and which contains price and quantity terms as well as signatures by the parties, is the controlling document.

### D.   Damages

Finally, Bond Safeguard asserts there are disputed material facts as to Augusta Fuel's claim for damages.  *Def.'s Obj*. at 14.  Augusta Fuel's demand in the Complaint was for the full $1,625,000 on the Bond.  *Compl*. ¶ 15.  In its motion for summary judgment, it clarified that it is seeking $1,262,315, which represents the amount Augusta Fuel paid for replacement fuel ($1,169,102) plus interest ($93,213).[14]  Bond Safeguard objects, contending there are three genuine disputes of fact as to the damages amount.

### 1.   Service Fee

First, Bond Safeguard takes issue with Augusta Fuel's damages calculation, in that the cost of replacement fuel includes a $0.10 per gallon delivery surcharge for the cost of deliveries it had to make that PPCOM would have made under the agreement. DSAMF ¶ 36; PRDSAMF ¶ 36.[15]  Under the agreement, PPCOM was required to make deliveries to Maine General Hospital's larger facilities in Augusta and Waterville, but

---

[14] Bond Safeguard points out that the correct figure for interest is $91,213.  DRPSMF ¶ 11.  This would bring the total down to $1,260,315.

[15] Peter Lawler, of Augusta Fuel, testified at his deposition that Augusta Fuel added a 10 cent per gallon surcharge for all fuel that it delivered to Maine General facilities from March 16, 2006 (the date of breach) to the end of July 2006 (the end of the contract period).  *Lawler Dep*. at 15 (Docket # 30-9); DRPSMF, Ex. 8.

Augusta Fuel was required to make deliveries to Maine General's smaller facilities. However, when Augusta Fuel calculated its damages it added a 10% surcharge to all deliveries, even the ones it would have made, had PPCOM performed under the agreement.  Bond Safeguard contends that Augusta Fuel is not entitled to the surcharge for deliveries to the smaller facilities, which were always Augusta Fuel's responsibility. *Def.'s Obj.* at 14-15.

In reply, Augusta Fuel admits that, as regards deliveries to the smaller facilities of Maine General Medical Center, it is not entitled to recover a surcharge.  *Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J.* at 4.  According to Augusta Fuel, it delivered 266,401 gallons of product to Maine General after PPCOM's default, and that "[b]ased on Maine General's prior consumption patterns, AFC would have delivered 10% of the fuel [26,640 gallons] to Maine General's smaller facilities with its own trucks . . . ." *Id.*; *see also* PSMF, Attach. 7.[16]  Therefore, it concedes that its damages calculation should be reduced by $2,664.  There is no longer any genuine issue of a material fact on this element of damage.

### 2.    Out-of-Contract Purchases

Bond Safeguard's second contention is that Augusta Fuel did not account for additional deliveries of 49,451.5 gallons of fuel purchased outside the contract with PPCOM, while PPCOM was still in business.  *Def.'s Obj.* at 15.  According to Bond Safeguard, this resulted in slowed consumption of "in-contract" fuel oil, and breached

---

[16] Augusta Fuel cites the deposition transcript of its president, Marc Lacasse, who testified that "close to 90 percent of the total product was being delivered to the larger facilities," directly by PPCOM. *Lacasse Dep.* at 110.  Augusta Fuel delivered the remaining 10 percent to the smaller facilities, using its own trucks. Bond Safeguard has provided nothing to suggest otherwise.

Augusta Fuel's contract with PPCOM, so as to relieve PPCOM of its obligation to perform under the contract.

As regards the first point, the reason PPCOM breached the contract was a supply issue, not a demand issue. That is, the contract failed because PPCOM became unable to continue supplying Augusta Fuel with oil, not because Augusta Fuel suddenly stopped consuming it. Thus, the out-of-contract purchases had no impact on PPCOM, and therefore will not affect Augusta Fuel's damages calculation. With respect to the second point, as Augusta Fuel points out, there is no language in the Master Agreement to suggest that this was an exclusive supply contract. Thus, Augusta Fuel's acquisition of 49,451.5 extra gallons – representing less than 4% of the contract with PPCOM – does not appear to be a breach of the contract. In fact, the contract seems to contemplate that Augusta Fuel might have multiple suppliers, as evidenced by the liquidated damages provision.

However, even if this were a breach, Bond Safeguard has failed to demonstrate it would be a material breach, relieving PPCOM of its duties under the contract. Under Maine law, "a material breach is 'a non-performance of a duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end.'" *Crowe v. Bolduc*, 334 F.3d 124, 138 (1st Cir. 2003) (quoting *Jenkins, Inc. v. Walsh Bros., Inc.*, 2001 ME 98, 776 A.2d 1229, 1234). The RESTATEMENT (SECOND) OF CONTRACTS provides five factors for determining a material breach, which Maine has adopted:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform . . . will suffer forfeiture; (d) the likelihood that the party failing to

> perform . . . will cure his failure . . .; (e) the extent to which
> the behavior of the party failing to perform or to offer to
> perform comports with standards of good faith and fair
> dealing.

*Id*. (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241).  Although Bond Safeguard

contends that "in obtaining fuel from other sources, AFC interfered with and hindered

PPCOM's ability to fulfill its contract obligations," and that it "is axiomatic that AFC's

breach of contract excused PPCOM's further performance under the contract," *Def.'s

Obj*. at 15, this is simply not the law.  Even if Augusta Fuel breached the contract,

PPCOM was not injured as a result.  At the time of PPCOM's default, Augusta Fuel still

had a demand for fuel; PPCOM was simply unable to supply the contracted-for product.

Augusta Fuel's out-of-contract purchases did not breach the contract and, if they did, they

were not a material breach.  The out-of-contract purchases do not excuse Bond Safeguard

from paying under its Bond, and does not create a genuine issue of material fact.

### 3.    Liquidated Damages

Finally, Bond Safeguard claims that, under the liquidated damages clause of the

Master Agreement, Augusta Fuel is liable to PPCOM for liquidated damages on the fuel

oil not received, which should be subtracted from Augusta Fuel's claim.  *Def.'s Obj*. at

16.  Albeit creative, this contract interpretation is not grounded in common sense.  The

clause to which Bond Safeguard refers reads:

> In the event that Buyer *fails to receive* any quantity of
> Product specified in the Sales Confirmation during the
> specified delivery period, then *Buyer will pay to Seller*, as
> reasonable liquidated damages for such deficiency, and not
> as a penalty, a fee equal to the difference between the
> aggregate purchase price for the unused volume and the
> average of Seller's daily reseller posted price for the
> Product for the applicable period, plus $.05/gallon,
> multiplied by the number of unused gallons.

*Master Agreement* at 1 (emphasis added).  According to Bond Safeguard, "[l]iterally applied, this language provides that AFC owes damages to PPCOM and Bond Safeguard," and Augusta Fuel failed to calculate this when computing its claim.  *Def.'s Obj.* at 16.  Bond Safeguard's interpretation of this clause is plainly wrong.

Although Bond Safeguard might perceive some ambiguity with respect to this provision of the contract, "a contract is ambiguous only when its terms, fairly construed, yield more than one reasonable interpretation."  *Crowe v. Bolduc*, 365 F.3d 86, 97 (1st Cir. 2004).  The reasonable interpretation of this provision is that, if oil prices drop and Augusta Fuel finds more advantageous prices elsewhere, Augusta Fuel might fail to receive (i.e., refuse to accept delivery of) fuel under the contract with PPCOM.  What actually occurred is exactly the opposite:  the price of oil rose, and PPCOM failed to deliver product to Augusta Fuel.  To construe this provision such that PPCOM would be compensated for its breach of the contract is clearly unreasonable.  The liquidated damages provision of the contract has no bearing on the calculation of Augusta Fuel's damages, and is not a genuine issue of material fact.

Although the Court has addressed each of Bond Safeguard's damages arguments, the Court remains unable to determine the exact amount of damages to which Augusta Fuel is entitled.  As Bond Safeguard points out, Augusta Fuel modified its calculation of damages at different stages of this litigation, and misstated the amount of interest paid through April 2007.  In addition, the interest calculation has presumably changed as of the date of this Order.  Finally, and most significantly, the parties do not agree on the proper measure of Augusta Fuel's damages.  *See* DRPSMF ¶ 9 ("Without prejudice to its other defenses, Bond Safeguard does not agree that the proper measure of damages is the

cost of replacement fuel . . . ."). Unfortunately, other than interposing a general objection, Bond Safeguard does not expound on this point in its opposition to Augusta Fuel's motion for summary judgment, leaving the Court to speculate as to whether Bond Safeguard's objections rests on disputes about genuine issues of material fact or whether its objections have been resolved by the Court's rulings on the express objections Bond Safeguard has itemized.

To clarify Augusta Fuel's current claim for damages and to determine whether Bond Safeguard has raised ongoing genuine issues of material fact, the Court ORDERS Augusta Fuel to submit a clarified, updated damages statement, with record citations, no later than **Friday, August 10, 2007**. The Court further ORDERS Bond Safeguard to file a response no later than **Tuesday, August 14, 2007**,[17] stating whether it concurs with the mathematical computation by Augusta Fuel and whether, following this Court's resolution of the damages issues it has raised, it maintains there remain genuine issues of material fact on damages that preclude summary judgment.

## V.   CONCLUSION

Because Bond Safeguard has failed to identify any genuine issues of material fact as to Augusta Fuel's right to collect under the bond, and because Bond Safeguard has failed to show sufficient evidence to establish its affirmative defense, the Court GRANTS IN PART Augusta Fuel's Motion for Summary Judgment solely on the issue of liability (Docket # 20). The Court STAYS its decision on damages.

---

[17] In the alternative, if the parties are able to stipulate to a damages figure by August 14, they may of course do so.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 8th day of August, 2007