UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| AUGUSTA FUEL COMPANY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOND SAFEGUARD INSURANCE COMPANY, | ) ) | |
| | ) | |
| Defendant | ) | |
| | ) | 06-CV-82-B-W |
| BOND SAFEGUARD INSURANCE COMPANY, | ) ) | |
| | ) | |
| Third-Party Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SKILLINGS SHAW & ASSOCIATES, INC., | ) ) | |
| | ) | |
| Third-Party Defendant | ) | |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

The underlying action between Augusta Fuel Company and Bond Safeguard Insurance Company has been resolved, leaving for resolution only the three-count, third-party claim by Bond Safeguard against Skillings Shaw & Associates. Skillings Shaw has filed a motion for summary judgment on all three claims of the third-party action based on an assertion that the testimony of Bond Safeguard's designated expert fundamentally undercuts all three claims. The Court referred the motion to me for recommended decision. Based on my review I recommend that the Court deny the motion.

**Factual and Procedural Background**

Augusta Fuel entered into a fuel oil supply contract with MaineGeneral Hospital in the spring of 2005. As a condition of that contract, MaineGeneral required that Augusta Fuel secure a performance bond in an amount equal to the contract price of the fuel. Augusta Fuel did so with the assistance of Skillings Shaw, securing a bond from Westchester Fire Insurance Company. MaineGeneral paid Augusta Fuel in advance and in full for the entire year's supply of oil that Augusta Fuel agreed to supply. In order to fulfill its supply obligation to MaineGeneral, Augusta Fuel entered into a separate supply contract with PPCOM, a regional supplier of fuel oil. That contract, too, required a bond, one that would secure Augusta Fuel against a default by PPCOM. Like Augusta Fuel, PPCOM obtained assistance from Skillings Shaw in securing a bond. Skilling Shaw sought a bond for this transaction from Bond Safeguard and Bond Safeguard issued a bond protecting Augusta Fuel in the event that PPCOM should fail to fulfill its supply obligation. Augusta Fuel paid in advance and in full for the entire volume of oil that PPCOM agreed to supply it with. In the following spring, after partially fulfilling its obligation to Augusta Fuel, PPCOM defaulted on its supply contract. Augusta Fuel obtained replacement oil from another supplier, thereby avoiding a default on its obligation to MaineGeneral, and demanded payment on the bond issued by Bond Safeguard. Bond Safeguard rejected Augusta Fuel's demand, causing Augusta Fuel to commence this litigation.

Augusta Fuel's claims against Bond Safeguard have been resolved by a summary judgment order in favor of Augusta Fuel. (Order on Pl.'s Mot. for Summ. J., Doc. 36.) What remains now is a third party action by Bond Safeguard against Skillings Shaw. In its third-party complaint Bond Safeguard alleges that Skillings Shaw is liable to Bond Safeguard for negligence in its role as bond agent, for negligently misrepresenting facts material to the issuance of the

bond, and under the common law for contribution or indemnification. (Third-Party Compl., Doc. No. 8.)

## Summary Judgment Fact Statement

The following facts are material to the summary judgment motion. They are drawn from the parties' statements of material facts in accordance with Local Rule 56. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

Skillings Shaw's agency agreement with Bond Safeguard allowed Skillings Shaw to solicit, prepare, and submit bond applications to Bond Safeguard. It also allowed Skillings Shaw to issue bonds on behalf of Bond Safeguard, but only after specifically authorized by one of Bond Safeguard's underwriters to do so. (Statement of Material Facts (SMF) ¶ 8, Doc. No. 45; Opposing Statement of Material Facts (OSMF) ¶ 8, Doc. No. 47.) The agency agreement between Skillings Shaw and Bond Safeguard provides that Skillings Shaw will "conduct business in the best interest of [Bond Safeguard] and [] advance and protect [Bond Safeguard's] interests." (OSMF ¶ 21.)

Skillings Shaw provided Bond Safeguard with the Master Distillate and Gasoline Sales and Supply Agreement ("Master Agreement") that governed the agreement between PPCOM and Augusta Fuel, as well as the Sales Confirmation to Master Distillate and Gasoline Sales and Supply Agreement ("Sales Confirmation"). The latter document was unsigned and the volume and price of the oil were not specified. (SMF ¶ 9; OSMF ¶ 9.) The signed Master Agreement did not clearly indicate whether Augusta Fuel was required to pay the entire contract price up

3

front, prior to any deliveries. (SMF ¶ 14.) Bond Safeguard says that a perusal of the Master Agreement would have suggested periodic shipments and payments based on the following language:

> "Each transaction between Buyer and Seller for the sale and purchase of Product will be evidenced by a Sales Confirmation [form]" and that "[u]nless otherwise specified in the Sales Confirmation Buyer will prepay the purchase price for all products."

(OSMF ¶ 43.) The unsigned Sales Confirmation form provided:

> PAYMENT TERMS: UPON SIGNING THIS AGREEMENT

It also provided:

> TOTAL VALUE OF CONTRACTS: $_____
> TOTAL DEPOSIT/PREPAYMENT: $____IN FULL_____

(SMF ¶ 14; Sales Confirmation, Doc. No. 45-4 at 54.)

Contemplating what Bond Safeguard might reasonably have inferred from reading the contract documents is a rather curious task because Bond Safeguard's underwriter, Christopher Dobbs, did not read the documents or question whether the agreement called for an advance payment component or not. (SMF ¶ 10.)[1] Mr. Dobbs testified that he may have "glanced" at the contract documents prior to approving the issuance of the bond. He could not say whether he would have issued the bond had he read the contract, which further supports the finding that he did not read the contract. (OSMF ¶ 12; Dobbs Dep. at 14, Doc. No. 45-4 at 101.) There is no indication that anyone else at Bond Safeguard reviewed the application prior to issuing the bond. In any event, there was no direct communication from Skillings Shaw to Bond Safeguard to the effect that the contract required Augusta Fuel to prepay the contract price in full. (SMF ¶ 14;

---

[1] Ms. Roth offers an opinion about what a review of the documents would have disclosed (OSMF ¶¶ 50-51), but her view that the contract documents supplied with the application appeared to require pre-payment for each delivery seems beside the point, as Dobbs did not read the documents and there is no indication whether Ms. Martel did either.

4

OSMF ¶¶ 14, 40.)  Prior to this bond application, Bond Safeguard had not provided Skillings Shaw or other agents with any guidelines, written or verbal, suggesting that it would not issue supply bonds on contracts with an advance payment component.  (SMF ¶ 15.)

Bond Safeguard offers a statement to the effect that it "understood that the contract to be bonded involved the supply of fuel oil by PPCOM to Augusta Fuel and payment by Augusta Fuel to PPCOM upon each delivery of fuel oil."  (OSMF ¶ 42.)  In support of this statement there is a citation to an exhibit labeled "Campbell Deposition."  That exhibit is actually a three-page excerpt from the deposition transcript.  It is impossible to determine from the exhibit what role Mr. Campbell played in regard to the issuance of the bond, due to the fact that only three pages are offered.  The materiality of the statement is unclear because it is unclear what Mr. Campbell's subjective understanding had to do with the events giving rise to this case.  Also according to Mr. Campbell, had Bond Safeguard known that Skillings Shaw was applying for an advance payment bond, Bond Safeguard would have rejected the application because of the substantially greater risk of bonding an advance payment transaction.  (OSMF ¶ 44.)

In support of its claims against Skillings Shaw, Bond Safeguard relies on expert testimony supplied by Deborah M. Roth, currently a branch manager for American Contracting Services, Inc., who, according to her resume, works in various surety markets.[2]  (Doc. No. 47-15 at 7.)  Ms. Roth is offered as an expert who would opine that the "industry standards" that apply to an agent require the agent to disclose in an application for a supply bond that the supply

---

[2]   I draw this from a resume attached to Bond Safeguard's expert designation and include it solely for the Court's information.  The resume is not really a proper piece of record evidence as it is currently presented, because the designation is drafted by counsel and the resume is not introduced by, authenticated by, or incorporated into any of the sworn testimony cited in the summary judgment record.  Skillings Shaw has made the proper objections and has requested that statements relying on the designation and its attachments be stricken.

contract includes an advance payment condition.[3]  She would also testify that an agent should disclose to a bonding company situations in which the agent is helping to procure a bond for more than one party in related transactions.

Ms. Roth maintains that underwriters "rely on the agents to point out . . . anything out of the ordinary" in a bond application.  (OSMF ¶ 55.)  However, the statements of material facts lack any indication whether the Skillings Shaw personnel involved in presenting the bond application had any subjective understanding that the supply contract required prepayment in full by Augusta Fuel.  This point is emphasized by Skillings Shaw in its reply statement.  Ms. Roth, Bond Safeguard's expert, indicated at her deposition that she did not know whether Sharon Martel, the Skillings Shaw agent who submitted the application materials to Bond Safeguard, had the information in her possession at the time.  Additionally, Ms. Roth testified that, if Ms. Martel lacked the information, it would be "difficult to criticize her."  (Reply Statement of Material Facts (RSMF) ¶ 49, Doc. No. 51.)  According to Ms. Roth:  "*If* Skillings Shaw knew that it was a prepaid bond that should have been stated right up front and not left to find like a needle in the haystack, so to speak."  (OSMF ¶ 54 (emphasis added).)

There is no indication in the record that Ms. Martel or any other Skillings Shaw agent involved with this application ever reviewed the contract documents, only that Ms. Martel forwarded them to Mr. Dobbs with the application.  However, there is evidence that Skillings Shaw had documents in its possession connected with the Augusta Fuel-MaineGeneral contract that were not forwarded to Bond Safeguard in connection with the bond.  Specifically, when Skillings Shaw applied for the Westchester bond to secure Augusta Fuel's supply obligation to

---

[3]      This is my characterization based on my review of the deposition testimony I have reviewed in conjunction with the motion.  Bond Safeguard would have the Court lift language out of an unsworn and unauthenticated letter attached to its expert designation.  I have chosen, instead, to rely on Ms. Roth's sworn deposition testimony.  There does not appear to be a Roth affidavit in the record.

MaineGeneral, Skillings Shaw included a PPCOM document in the application materials that referenced PPCOM's "prepaid programs" with various customers.  (OSMF ¶¶ 36, 41.)  In addition, Skillings Shaw obtained a copy of the contract between Augusta Fuel and MaineGeneral.  That document includes a line reading:

> Special Terms:  Prepaid, Fixed Price of $1.398 per gallon (#2 Heating Oil)

There is another line reading:

> Full payment of $1,817,400 (1.3 million gallons of #2 heating oil @ 1.398 per gallon) due by:  3/28/05

(OSMF ¶ 34; Doc. No. 47-8)  There is no indication in the record whether any Skillings Shaw agent reviewed any of these documents.

Ms. Roth agreed at her deposition that "whether you actually in practice read every line of something you have seen before[,] you know as an underwriter if it is sent to you, you have a responsibility to look at it."  (SMF ¶ 18;  Roth Dep. at 34, Doc. No. 45-2.)  She also agreed that "[o]ne of the things that you would have been looking at . . . is the nature of the payment . . . and the schedule on which it was being made" and that, "[i]f you could not understand that, you needed to request more information from your producer or agent."  (SMF ¶ 18;  Roth Dep. at 34-35.)  She also agreed that, "as an underwriter[,] you would have the obligation" to review the contract documents "by at least reading them" and that she would have expected "somebody at Bond Safeguard would have read them."  (SMF ¶ 18;  Roth Dep. at 73.)  Ms. Roth also testified that Bond Safeguard could have inquired about the payment terms before issuing the bond or could have instructed its agents not to present bond applications for prepaid supply contracts.  (SMF ¶ 18;  Roth Dep. at 85-86.)  The following testimony is also salient:

> Q    So that if that is a make or break question for them on whether or not they are going to issue a bond, they need to be prepared to run that to ground before they issue a bond, don't they?
> A    Yes.
> Q    And in this case, the documentation they were provided does not absolutely exclude the point that there was an advanced payment involved here, does it?
> [Objection by counsel]
> A    I guess not. I would take it to not have been an advanced payment based on that, but probably.

(SMF ¶ 18; Roth Dep. at 87.) Ms. Roth maintains that a reading of the Master Distillate and Sales Confirmation documents suggests to her, personally, separate payments per delivery rather than prepayment of the entire supply. (OSMF ¶ 51.) Her deposition testimony on this issue reads:

> Q    Would you agree that as an underwriter . . . reading a contract like that . . . that it is at least not clear to you what payment schedule is going to be followed under that contract?
> [Objection]
> A    I don't know that it is actually clear. I actually took it as it was prepaid for each delivery that was to be made, but not the entire contract up front.
> Q    Okay. Do you think that is clear under the agreement?
> A    Well, obviously it was not. When I first read it, I thought it was clear, but that is how I interpreted it.
> . . . .
> Q    Are you aware that [Ms. Martel], from reading this agreement, was unclear as to how the payment would be made? Are you aware of that?
> A    I believe I was told that, yes.
> Q    I take it you would have no criticism with her from her interpretation of the agreement if that was her take on it; is that fair?
> A    That is fair.

(Id.; Roth Dep. at 38-39.) Subsequently in her deposition, Ms. Roth conceded that, if she had been in Ms. Martel's shoes, and had in her possession only the materials Ms. Martel forwarded to Bond Safeguard, that she would have done the same thing Ms. Martel did and, "[i]f they did not

8

ask any other questions and they gave you the authority to issue the bond," she would have done so. (SMF ¶ 18; Roth Dep. at 88.[4])

Bond Safeguard also complains that Skillings Shaw should have informed it that Skillings Shaw had served as the agent for the related, Westchester bond application. On this issue the record reflects that Bond Safeguard did not provide its agents with any guidelines suggesting that it would not issue bonds if the agent had also handled other bonds related to the same transaction. (SMF ¶ 16.) Mr. Dobbs did not question whether Skillings Shaw had handled other bonds related to the same transaction, though the Sales Confirmation included a reference to MaineGeneral. (SMF ¶ 11.) Finally, Ms. Roth testified that disclosure of such a situation is an ethical matter and that "it would not have been of concern" to her if she had been in the underwriter's position (the position Mr. Dobbs filled). (RSMF ¶ 52; Roth Dep. at 130.) Her testimony reflects that she has sought to serve as the producer for bonds for more than one party to a transaction, although she feels one has an ethical obligation to disclose that fact when the application is submitted. (OSMF ¶¶ 52-53; RSMF ¶¶ 52-53; Roth Dep. at 102-103, 121-22.[5])

### Discussion

The third-party complaint contains three counts: negligence, negligent misrepresentation, and contribution/indemnification. (Third-Party Compl., Doc. No. 8.) Skillings Shaw argues that summary judgment should enter against the third-party claims because Bond Safeguard's "own expert witness has testified that [Skilling Shaw] did not breach any duty of care it was alleged to have breached." (Third-Party Def.'s Mot. Summ. J. at 1, Doc. No. 44.) In support of its assertion that the record cannot support a finding of a breach of duty, Skillings Shaw makes a

---

[4] This testimony is apparent from a reading of page 87 of the deposition transcript that carried over onto page 88. Neither party appears to cite page 88, however. I have included it because it is difficult to ignore.
[5] Again, although Bond Safeguard cites only the answer provided at page 122, page 121 contains the question being answered and I reviewed it when checking the citation.

supplemental argument that Roth's testimony reflects that Bond Safeguard should have exercised more care to protect itself because it had a responsibility to ask the proper questions to obtain the information it needed to evaluate the risk being bonded. (Id. at 5-6.) Additionally, Skillings Shaw argues that expert testimony is essential to establish the standard of care in this case, because it involves allegations of professional negligence, and that Ms. Roth's testimony is not sufficient to demonstrate a breach of any such standard. (Id. at 7.)

In opposition, Bond Safeguard argues that Skillings Shaw owed Bond Safeguard a duty as its agent to disclose all material information known or available to Skillings Shaw. Bond Safeguard contends that Ms. Roth is of the opinion that Skillings Shaw breached that duty by failing to disclose the payment terms of the PPCOM-Augusta Fuel contract. (Opposition Mem. at 8-9, Doc. No. 48.) According to Bond Safeguard: "There is nothing in Ms. Roth's deposition transcript that can be fairly construed as contradicting" this point. (Id. at 9.) Bond Safeguard also argues that Skillings Shaw must be treated as having known of the prepayment condition in the supply agreement because it was in possession of the PPCOM letter describing PPCOM's various prepayment customers and because it had the Augusta Fuel-MaineGeneral contract that called for prepayment in full under that contract. (Id. at 10.) In summary, Bond Safeguard argues:

> [Skillings Shaw] plainly had a duty to disclose the facts that the underlying contract between PPCOM and Augusta Fuel called for pre-payment of the entire quantity of fuel oil, and that [Skilling's Shaw] was involved in both ends of the fuel oil transaction. Having failed to do so, [Skillings Shaw] breached its duty of due care owed to Bond Safeguard.

(Id. at 13.)

To begin, I note that Bond Safeguard does not contest the assertion by Skillings Shaw that breach of a duty of due care must be demonstrated in order to succeed on all

10

three of the claims in the third-party complaint. Neither of the parties actually briefs the specific elements of the separate claims in a methodical fashion. I treat their approach as a mutual concession that all three claims, like the motion itself, require proof of the existence of a breach of duty. I also conclude that this is a common law of torts issue, exclusively, because there is no contract claim in this case. Because the claim of breach is premised on two omissions I focus on those omissions to determine if they can establish a breach of duty. To set the stage for that discussion, it must be noted that neither party identifies any legal duty established by state decisional or statutory law. The only standards suggested are the "industry standards" that Bond Safeguard seeks to establish through the testimony of its expert, Ms. Roth. Skillings Shaw has not challenged Ms. Roth's opinion as unreliable or argued any of the Daubert/Rule 702 factors in support of its motion. Instead, it argues that Ms. Roth essentially agreed during her deposition that a breach of duty could not be found on this record. I think a genuine issue exists on that question.

Based on my review of Ms. Roth's deposition testimony it is very apparent to me that there are serious questions as to how much weight her testimony about industry standards should be given, including whether the weight of her testimony actually favors a verdict for Skillings Shaw when it comes to issues of comparative negligence and causation.[6] However, the rifle-shot approach of the pending motion concerns duty and

---

[6] Comparative negligence seems to present a particular problem for Bond Safeguard. The Court has already concluded that Bond Safeguard did not exercise due diligence. (Order on Pl.'s Mot. for Summ. J. at 15-16, Doc. No. 36.) The third-party claims essentially are an effort to allocate blame between the bonding firm and its agent for the failure to exercise due diligence. Ms. Roth allows that Bond Safeguard could have better protected itself from this predicament by giving specific notice to its agents of its professed unwillingness to issue bonds on advance payment transactions. Causation is also something of a problem because, even if Ms. Martel had included all of the omitted

breach exclusively.  I conclude that, although Ms. Roth's testimony presents these various problems for Bond Safeguard's case, Ms. Roth does not fundamentally undermine her opinions that there is a duty to disclose an advance payment agreement when it should be apparent[7] to the agency that it exists and that there is an ethical duty to disclose participation in two interrelated bond applications.  As for breach, although Mr. Roth allows that Ms. Martel is not to be blamed personally for not knowing of the condition calling for advance payment in full, the fact remains that Skillings Shaw had in its possession relevant documents that would have flagged the likely existence of the condition and I cannot conclude as a matter of law that the relevance of the Augusta Fuel-MaineGeneral documents and the need for their disclosure should not have been apparent to Skillings Shaw given its role as the producer of both bonds.

      Skillings Shaw contends that the Sales Confirmation form should have placed Bond Safeguard on notice of the possibility of an advance payment agreement and makes much of the fact that Ms. Roth allowed that the documentation did not make the question perfectly clear.  A reading of the Sales Confirmation may well call into question the existence of an advance payment arrangement in that transaction, but it might also be regarded as a form of receipt that would be used to confirm periodic deliveries and payments.  After all, quantity and price figures are left blank in the document, so it is possible that the form could have been used as a receipt to record payment in full of the initial delivery made under the Master Agreement.  By comparison, the Augusta Fuel-MaineGeneral contract explicitly indicates that advance payment of the entire year's

---

Augusta Fuel-MaineGeneral bond application documents in her application materials for PPCOM's bond, there is some cause to infer that Mr. Dobbs would not have reviewed them.

[7]     I use the term "apparent" in order to capture the situation where the fact in question is not actually known but circumstances suggest that it should have been known.

supply is required. Although it is a separate agreement from Augusta Fuel's agreement with PPCOM, there is a connection between the two transactions that must be treated as within Skilling Shaw's knowledge. The failure to disclose this relationship and all of the associated documents, and the failure to disclose Skillings Shaw's roll as producer for both of the transactions was, according to Ms. Roth, a breach material to Bond Safeguard's decision to approve the issuance of the bond. I therefore conclude that a genuine issue of material fact exists on the question of whether Skillings Shaw breached a duty to Bond Safeguard.

## Conclusion

Whether the record is sufficient to support a finding that Skillings Shaw breached a duty of care it owned to Bond Safeguard is a very close call to make, but an affirmative finding appears to be supported by Ms. Roth's testimony. Accordingly, I RECOMMEND that the Court DENY the motion and allow the fact finder to assign the respective blame between the parties.

## CERTIFICATE

Any objections to this Memorandum of Decision shall be filed in accordance with Fed. R. Civ. P. 72.

*So Ordered.*
March 10, 2008                    /s/ Margaret J. Kravchuk
                                  U.S. Magistrate Judge